# EXHIBIT 1

| | |
|---|---|
| **From:** | Schlitz, Amanda K |
| **To:** | Patricia Redmond |
| **Subject:** | Ivankovich Family LLC (Bankr. S.D. Fla. 24-15755) |
| **Date:** | Wednesday, December 31, 2025 6:00:16 PM |
| **Attachments:** | Urgent Legal Matter20251230_153520_b120259.pdf |

Hi Trish – I'm sure our paths have crossed during an IWIRC or other bankruptcy event, but it's nice to meet you in this context! I'm reaching out as a courtesy as I understand you represent Schiller DuCanto & Fleck LLP in the above-referenced case. The Bank received the attached correspondence from counsel for a judgment creditor of Steven Ivankovich asserting a first priority lien on the loan proceeds/disbursements to your client contemplated by the recently-entered agreed order. You may already be aware of this claim and the anticipated litigation, but I wanted to pass this along for your awareness. Please feel free to call if you'd like to discuss. Happy New Year!

**Amanda K Schlitz**
Vice President | Senior Corporate Counsel
c. 612.462.1575 | amanda.schlitz@usbank.com

**U.S. Bank**
**US Bancorp Ctr, Minneapolis**
800 Nicollet Mall, Minneapolis, MN 55402-7020 | BC-MN-H21N | usbank.com

U.S. BANCORP made the following annotations

-------------------------------------------------------------------------

Electronic Privacy Notice. This e-mail, and any attachments, contains information that is, or may be, covered by electronic communications privacy laws, and is also confidential and proprietary in nature. If you are not the intended recipient, please be advised that you are legally prohibited from retaining, using, copying, distributing, or otherwise disclosing this information in any manner. Instead, please reply to the sender that you have received this communication in error, and then immediately delete it. Thank you in advance for your cooperation.

-------------------------------------------------------------------------



Meister Seelig & Fein PLLC

Benjamin D. Bianco
*Partner*
Direct (646) 539-3791
Fax (646) 519-7232
bdb@msf-law.com

December 29, 2025

**--URGENT LEGAL MATTER--**

**VIA FEDERAL EXPRESS**

U.S. Bank
80 South 8th Street, Suite 224
Minneapolis, Minnesota 55402

U.S. Bank
800 Nicollet Mall
Minneapolis, Minnesota 55402

**Re:**   *Jeanette Ivankovich v. Steven Ivankovich*
        Circuit Court of Cook County Illinois (Case # 2021 D. 00920)

To whom it may concern:

I am outside counsel for PAMI Grand Too LLC ("PAMI"), a creditor of Steven Ivankovich.  On July 29, 2022, in the Circuit Court for Miami/Dade County, Florida, my client had a charging order entered against numerous limited liability companies ("LLCS") that Steven Ivankovich has or may have had an interest in (Case number 2022-010735-CA-01).[1]

PAMI also issued a citation to Jeanette Ivankovich in the Circuit Court for Cook County, Illinois. The legal effect of the Charging Order and the citation was twofold: 1) it placed Jeanette Ivankovich and her counsel, Schiller DuCanto & Fleck, LLP ("Schiller"), on notice that PAMI had a judgment lien on all assets of the debtor Steven Ivankovich, and 2) that the judgment of PAMI was superior to any marital property interest that Jeanette Ivankovich may claim to the assets of Steven Ivankovich.  The assets of Steven Ivankovich include any loan made by a third-party to Steven Ivankovich.

On December 9, 2025, in the context of a confirmed Chapter 11 Plan, for the Chapter 11 debtors (Ivankovich Family LLC, A&O Family LLC (FL), A& O Family (IL), and P2 Managing Member LLC), in a case pending in the United States Bankruptcy Court for the Southern District of Florida

---

[1] *See* Charging Order, Exhibit 1 hereto.

*U.S. Bank*
*Page 2*
*December 29, 2025*

(consolidated as Case Number 24-15755-LMI), the Chapter 11 debtors, along with claimants Jeanette Ivankovich and Schiller, secured an Agreed Order by the Court.

Pursuant to the Agreed Order, the debtors were required to loan Steven Ivankovich approximately $1,700,000, that was to be wired directly to Schiller's U.S. Bank account, in the amount of $425,000, and to Jeanette Ivankovich, in the amounts of $1,131,887.86, plus per diem interest from December 10, 2025, in the daily amount of $244.68. The Schiller loan funds were wired to Schiller's U.S. Bank account, ending with the last four account numbers 7666.[2]

On December 21, 2025, Steven Ivankovich and the Chapter 11 debtors executed a Loan Agreement.[3] Established Illinois case law mandates that a third-party loan made to a judgement debtor becomes the asset of the judgement debtor when the loan is made.[4]

PAMI is not a party to the Chapter 11 cases. The notice herein should in no way be interpreted to interfere with the Agreed Order, or the loan advance, pursuant to the Order made by the Chapter 11 debtors.

The purpose of this Letter, on behalf of PAMI, is to place U.S. Bank on notice that the loan proceeds wired to Schiller's U.S. Bank Account, number ending 7666, are assets of Steven Ivankovich, upon which PAMI has a first lien priority.

My Firm has been instructed to file a complaint for declaratory judgment that will seek injunctive relief against U.S. Bank to maintain the funds, in "status quo," until a court of competent jurisdiction enters a final judgment on the priority between the claim of Jeanette Ivankovich and Schiller, and my client PAMI, a judgment creditor having lien claims on all assets of Steven Ivankovich.

I am available to discuss this with you or your counsel at any reasonable time. We apologize for having to involve you in the pending divorce proceedings between the Ivankovichs, however, my client has a judgment against Steven Ivankovich for more than $25,000,000, and PAMI will not allow the Ivankovichs, though the divorce, to engage in fraudulent conveyances in an attempt to avoid the payment of PAMI's judgment.

---

[2] *See* Agreed Bankr. Order, Exhibit 2 hereto.

[3] *See* Loan Agreement, Exhibit 3 hereto.

[4] *See National Life Real Estate Holdings LLC v. Scarlato*, 2017 IL. App. (1st) 161943; *see also Report & Recommendation of Hon. Sidney I Schenkier*, May 14, 2025, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 20-cv- 04985.

*U.S. Bank*
*Page 3*
*December 29, 2025*

Govern yourself accordingly,

MEISTER SEELIG & FEIN PLLC

By: _____/s/_____
         Benjamin D. Bianco

Filing # 154351467 E-Filed 07/29/2022 03:23:36 PM

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2022-010735-CA-01
SECTION: CA10
JUDGE: Peter R. Lopez

**Pami Grand Too LLC**

Plaintiff(s)

vs.

**Ivankoivch, Steven**

Defendant(s)

_____ /

## ORDER ON JUDGMENT CREDITOR, PAMI GRAND TOO LLC'S EX-PARTE MOTION FOR CHARGING ORDER IN ITS FAVOR AGAINST PAYMENTS FOR PROFITS AND DISTRIBUTIONS TO JUDGMENT DEBTOR, STEVEN IVANKOVICH

THIS CAUSE having come before the Court on Judgment Creditor, PAMI GRAND TOO LLC's Ex-Parte Motion for Charging Order in its Favor Against Payments for Profits and Distributions to Judgment Debtor, Steven Ivankovich (the "Motion"), and the Court having reviewed the Court's file and the Motion, reviewed and considered the applicable law, and being otherwise fully advised in the premises, it is hereby:

**ORDERED AND ADJUDGED** as follows:

1. PAMI GRAND TOO LLC's (the "Judgment Creditor") Motion is **GRANTED**.

2. The Court, pursuant to Fla. Stat. § 605.0503, hereby imposes a Charging Order in favor of the Judgment Creditor in the amount due under the Final Judgment on Guaranty domesticated in Florida and recorded in the Official Records of Miami-Dade County, Florida pursuant to Fla. Stat. §§ 55.503 and 55.505 at Book 33238/Page 712 (the "Judgment"), which currently exceeds $12.6 million USD, and against the interests of Judgment Debtor, Steven Ivankovich (the "Judgment Debtor"), in Overlook Managing Member, LLC, Ivankovich

Family LLC, P2 Portfolio Managing Member LLC, Tyler Atlas, LLC, Alliance HTTX LLC, Atlas Apartment Homes LLC, Atlas Apartment Holdings LLC, Atlas Birchwood LLC, Atlas Crowntree Lakes, LLC, Atlas Alexandria & Parc Vue, LLC, Premier Orlando Portfolio Two LLC, Atlas Multifamily Three, LLC, Atlas MF Mezzanine Borrower, LLC, and Atlas Apartments Acquisition LLC, including, but without limitation, his membership interests.

3. This Charging Order constitutes a lien against the transferable interests of the Judgment Debtor in and to Overlook Managing Member, LLC, Ivankovich Family LLC, P2 Portfolio Managing Member LLC, Tyler Atlas, LLC, Alliance HTTX LLC, Atlas Apartment Homes LLC, Atlas Apartment Holdings LLC, Atlas Birchwood LLC, Atlas Crowntree Lakes, LLC, Atlas Alexandria & Parc Vue, LLC, Premier Orlando Portfolio Two LLC, Atlas Multifamily Three, LLC, Atlas MF Mezzanine Borrower, LLC, and Atlas Apartments Acquisition LLC (collectively, the "Companies"), for payment of the unsatisfied amount of the Judgment, with interest.

4. The lien shall continue to encumber the property described until all amounts due under the Judgment have been satisfied or otherwise ordered by the Court.

5. The Companies are directed to pay to the Judgment Creditor all distributions to which the Judgment Debtor would have otherwise been entitled by virtue of his limited liability company interests until all amounts due under the Judgment against the Judgment Debtor and in favor of the Judgment Creditor have been satisfied.

6. Any such payments for distributions shall be made payable to PAMI Grand Too LLC, and sent to the attention of Judgment Creditor's counsel, Aaron A. Resnick, Law Offices of Aaron Resnick, P.A., 100 Biscayne Blvd., Suite 1607, Miami, Florida 33132.

7. The Judgment Debtor shall not attempt to transfer or encumber his membership interest in any of the Companies.

8. The Judgment Creditor shall personally serve a copy of this Order and the Motion on the

Companies, and such service will constitute notice of this lien on any interest of the Judgment Debtor as a member in the Companies.

9. The Court retains jurisdiction for the enforcement of this Order and the entry of further orders necessary to effectuate the purpose of this Order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 29th day of July, 2022.

2022-010735-CA-01 07-29-2022 3:06 PM
Hon. Peter R. Lopez

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Aaron Resnick, efile@thefirmmiami.com
Aaron Resnick, aresnick@thefirmmiami.com
Aaron Resnick, nazarena@thefirmmiami.com

**Physically Served:**



ORDERED in the Southern District of Florida on December 9, 2025.

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
www.flsb.uscourts.gov

Chapter 11

In re:

IVANKOVICH FAMILY LLC
A&O FAMILY LLC (FL),
A&O FAMILY LLC (IL),
ATLAS P2 MANAGING MEMBER, LLC,

Debtors.

Case No. 24-15755-LMI
(Jointly Administered)
24-15762-LMI
24-15767-LMI
24-15770-LMI

/

**AGREED ORDER GRANTING REORGANIZED DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE REORGANIZED DEBTORS TO DISBURSE FUNDS FROM THE DISPUTED CLAIM RESERVE TO SATISFY THE REMAINING JEANETTE AND SCHILLER CLAIMS**

THIS MATTER came before the Court on the *Reorganized Debtors' Motion For Entry Of*

*An Order Authorizing The Reorganized Debtors To Disburse Funds From The Disputed Claim*

*Reserve To Satisfy The Remaining Jeanette And Schiller Claims* (ECF No. 678) (the "Motion").

The Court having reviewed the Motion, having been advised that the Reorganized Debtors, Olga

Ivankovich and Anthony Ivankovich ("the Ivankovichs"), Steven Ivankovich ("Steven"), the

Disbursing Agent, and Adversary Defendants Jeanette Ivankovich ("Jeanette") and Schiller

Ducanto & Fleck LLP ("Schiller") (Jeanette and Schiller are the "Defendants"), are in agreement

with this order, the Court finds that good cause exists for granting the relief requested, it is:

**ORDERED** that

1.      The Motion is **GRANTED**.

2.      Celadon Financial Group, LLC ("Celadon"), Wedbush Securities, Inc.

("Wedbush"), and the Disbursing Agent[1] are authorized to disburse, and shall disburse, as a loan

by the Reorganized Debtors to Steven via wire transfer directly to the Defendants according to the

instructions previously provided by the Defendants, within 3 days of the date of this order, the

sums identified by the Reorganized Debtors from the Jeanette Ivankovich Disputed Claim Reserve

necessary to fully satisfy the Remaining Jeanette Claim and the Remaining Schiller Claim, as

follows: (a) $1,131,887.86, plus per diem interest after December 10, 2025 at $244.68 per day

(consisting of support and maintenance in the amount of $992,311.00, plus interest from

November 2023 through December 10, 2025 in the amount of $139,576.86) to Jeanette; and (b)

$425,000.00 (consisting of attorneys/expert fees) to Schiller.

3.      The Reorganized Debtors are authorized to execute and proceed with the

Memorandum of Understanding attached to the Motion as Exhibit A governing the funding made

by the Reorganized Debtors in paragraph 2 herein.

---

[1] All capitalized terms shall have the same meaning as defined in the Motion unless otherwise defined herein.

2

4.      The relief granted herein shall not act as an estoppel, waiver, or release of any setoff or recoupment claim, if any, that the Reorganized Debtors, Steven Ivankovich, Dr. Anthony Ivankovich, or Dr. Olga Ivankovich may assert in the Dissolution Proceeding under Illinois law related to an overpayment of spousal support, child support, or legal fees related to spousal support of child support.

5.      Upon confirmation that the Remaining Jeanette Claim and Remaining Schiller Claim have been fully funded and satisfied, Celadon, Wedbush, and the Disbursing Agent shall be authorized to transfer all remaining funds in the Jeanette Ivankovich Disputed Claim Reserve to A&O Family, LLC (FL) pursuant to the terms of the Plan and Confirmation Order, and the Adversary Proceeding.

### 

Submitted by:

Eyal Berger, Esq.
Florida Bar No. 0011069
eyal.berger@akerman.com
**AKERMAN LLP**
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL  33301
Tel:  954-463-2700
Fax:  954-463-2224

Attorney Berger is directed to serve copies of this Order upon all interested parties and to file a certificate of service with the Court.

3

Docusign Envelope ID: 847A1519-6B09-4B04-9BC5-935FEB55C97E

**LOAN AGREEMENT**

EFFECTIVE DATE DECEMBER 15, 2025

This loan agreement is made the "Reorganized Debtors" : Ivankovich Family, LLC (4590), A&O Family, LLC, a Florida limited liability company (6789), A&O Family, LLC, an Illinois limited liability company (6865), and Atlas P2 Managing Member, LLC (8311). (identified by the las 4 digits of their respective EIN #) Collectively ("Lender")

The "Loan" is made to the Steven V. Ivankovich, ("Borrower") pursuant to the Reorganized Debtors *Motion for Entry of An Order Authorizing the Reorganized Debtors to Disburse Funds from the Disputed Claim Reserve to Satisfy the Remaining Jeanette and Schiller Claims* (Docket No. 678) (the "**Motion to Disburse**"). The Motion to Disburse, among other things, requested Court approval to authorize, but not direct, the Reorganized Debtors to disburse funds from the Disputed Claim Reserve to satisfy the Remaining Jeanette and Schiller Claims and authority for the Disbursing Agent to effectuate the disbursement of the Loan to Steven and remit payment directly to Jeanette and Schiller in full and final satisfaction of the Remaining Jeanette and Schiller Claims.

On December 10, 2025, the Court entered the Agreed Order granting the Motion to Disburse. While the Motion to Disburse did not set forth a time period to effectuate the disbursement, the Agreed Order, among other things, authorized the Disbursing Agent to disburse the Loan via wire transfer directly to the Defendants and established a deadline of "3 days" to effectuate the disbursement (the "**Disbursement Deadline**"). *See* Agreed Order, ¶ 2.

On December 12, 2025, the Reorganized Debtors filed a Motion to Modify the Agreed order to extend the date of the disbursement to December 23, 2025.

Pursuant to the terms of the "Motion to Disburse the Reorganized Debtors agreed to loan the Borrower the following sums: (a) $1,131,887.86, plus per diem interest after December 10, 2025 at $244.68 per day (consisting of support and maintenance in the amount of $992,311.00, plus interest from November 2023 through December 9, 2025 in the amount of $139,576.86) to Jeanette; and (b) $425,000.00 (consisting of attorneys/expert fees) to Schiller.

The Reorganized Debtors are making this loan solely to facilitate the payment by the Borrower of the support orders entered against him in the divorce case pending in Cook County Illinois.

**The Loan.** Lender shall advance a sum not to exceed $1,700,864.00 (the "Loan Amount") to Borrower in strict accordance with the terms of this loan agreement (the "Loan Agreement"). The Loan is or will be evidenced by a Demand Note issued by Borrower (the "Note") to Lender of even date herewith. The Note sets forth the interest rate, repayment terms, and other provisions of the Loan. The terms of the Note are incorporated into this Loan Agreement by reference and made a part hereof as if stated in their entirety. The Borrower agrees that Lender is authorized to make the "Loan Payment", directly to the account of Jeanette Ivankovich and the Schiller law, in the amounts set forth in this Loan Agreement. The Lender agrees that the Loan Payment will be made to Jeanette Ivankovich, and the Schiller law firm from the assets in Reorganized Debtors Celadon and RBC accounts known as the claim reserve accounts. The Loan Payment when paid by the Reorganized Debtors shall satisfy the "allowed claims" of Jeanette Ivankovich and the Schiller law firm.

**Purpose and Use of Loan/ Disbursement of Loan Proceeds.** The entire Loan proceeds shall be utilized by Borrower to fund (a) $1,131,887.86, plus per diem interest after December 10, 2025, at $244.68 per day (consisting of support and maintenance in the amount of $992,311.00, plus interest from November 2023 through December 9, 2025, in the amount of $139,576.86) to Jeanette; and (b) $425,000.00 (consisting of attorneys/expert fees) to Schiller. and for no other purpose.

Docusign Envelope ID: 847A1519-6B09-4B04-9BC5-935FEB55C97E

**Security.** The security for the repayment of the Loan shall include the following collateral and other documents:

    A.  An Assignment of any all Limited Liability Company ("LLC") membership interests owned or alleged to be owned by the Borrower. This shall include any "marital property" interest of Steven as determined by a court of competent jurisdiction.

    B.  An Assignment of all claims that Steven has now or may have in the future against any Third Party.

    C.  All bank accounts , investment accounts, stocks, bonds, accounts receivables owned by Steven.

    D.  Borrower Pledge and Collateral Assignment Agreement (the "Borrower Pledge and Collateral Assignment Agreement") executed and delivered in conjunction with the making of the Loan with respect to the Purchase Equity under the Loan Agreement; and

    E.  UCC-1 Financing Statement to be filed as appropriate to evidence and perfect the security interest granted Lender by the Borrower Pledge and Collateral Assignment Agreement (the "Borrower UCC-1"); and

The Note, the Borrower Pledge and Assignment Agreement, this Loan Agreement, the Guaranty and any and all other documents executed to evidence, secure and/or otherwise pertaining to the Loan shall collectively hereinafter be referred to as the "Loan Documents".[1]

**Conditions Precedent.** The obligation of Lender to make the Loan is conditioned upon he satisfaction of the Borrower of the following conditions precedent: Lender shall have received the fully executed original of the Note and the other Loan. Documents: and Lender shall have received such evidence of identity and competency as Lender shall require. The Parties acknowledge that due to the time constraint requiring that the Loan be disbursed not latter than December 23, 2025, the Loan Documentation is anticipated to be completed subsequent to the Loan Disbursement. The pledge assignment and security interests granted pursuant to this Loan Agreement are Effective on December 15, 2025, between the Lender, Borrower the loan beneficiaries and any third party have actual or constructive knowledge of the Motion to Disburse Funds.

INTENTIONALL BLANK

Docusign Envelope ID: 847A1519-6B09-4B04-9BC5-935FEB55C97E

**Defaults.** The occurrence of any one or more of the following events shall constitute a default (an "Event of Default") hereunder and under the other Loan Documents:

(a)   Borrower shall fail to pay any installment of principal or interest or any other sum payable under the Note or any of the other Loan Documents within three (3) days of the date the same is due, without notice or demand, therefore.

(b)   Borrower shall default or fail to comply with any of its obligations under this Loan Agreement and/or any of the other Loan Documents within the time set forth therein for performance, or shall default in the performance of any of its obligations under any material contract now or hereafter entered into by Borrower with Lender and/or any of Lender's affiliates;

(c)   A transfer or assignment of Borrower's rights under the Pledged LLC Membership Interests whether voluntarily or by operation of law, shall have occurred without the prior written consent of Lender.

(d)   Borrower, /or any person other person shall file a voluntary or involuntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall commence a federal bankruptcy proceeding in which an order for relief or such other court order or statutory procedure which authorizes the case to proceed is entered against it, or shall file any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors; or shall seek or consent to or acquiesce in the appointment of any custodian, trustee receiver or liquidator of the Borrower, the Guarantor, any Project Borrower and/or of all or any part of the Project, or of any or all of the royalties, revenues, rents, issues or profits thereof, or shall make any general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due;

(e)   Any representation of or warranty made by the Borrower and/or Guarantor in any Loan Documents or in any other instrument which pertains to the Loan proves to have been incorrect when made in any material respect.

(t)   A final judgment or judgments for the payment of money shall be rendered against Borrower, the Guarantor and/or any Project Borrower, and such party shall have failed to satisfy the same (or obtain a stay on the execution on such judgment or to have bonded the same to Lender's reasonable satisfaction) within a period of thirty (30) consecutive days following the later of the date of entry thereof or the date Borrower has notice thereof;

2

Docusign Envelope ID: 847A1519-6B09-4B04-9BC5-935FEB55C97E

## Miscellaneous.

(a)      Any notice, demand or request under this Loan Agreement and/or any of the Loan Documents shall be made in writing and sent by recognized overnight delivery service to the addresses set forth below (or such other address designated in writing by either party to the other), and shall be effective when received:

TO: Lender:

Dr. Anthony D.
Ivankovich and Dr. Olga
Ivankovich
1150 Michigan Avenue
Wilmette, IL

660614

If to Borrower:

Steven lvankovich
Address and e-mail to be
provided

(b)      If any provision of this Loan Agreement, or the Note or any other Loan Document is found by a court of competent jurisdiction to be prohibited or unenforceable, it shall be ineffective only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision to the extent it is not prohibited or unenforceable, nor invalidate the other provision hereof.

(c)      This Loan Agreement shall be binding upon and inure to the benefit of Lender and Borrower and their respective heirs, personal representatives successors and assigns. Borrower may not, without the prior written consent of Lender, assign or delegate any of its rights or obligations under this Loan Agreement or under any of the other Loan Documents. The parties intend that no other person or entity has any claim or any interest in the Loan Agreement and/or any of the other Loan Documents, and no other person or entity is to have any right of action hereunder or thereunder.

(d)      Taken together with the Note, the Loan Documents and the other instruments, contracts and documents delivered in compliance herewith, this Loan Agreement is a complete memorandum of the agreement of Borrower and Lender. Waivers of any provision hereof must be in writing signed by the party to be charged with the effect thereof. This Loan Agreement and/or any of the other Loan Documents shall not be amended, modified and/or supplemented except in writing executed by both parties.

(e)      Except to the extent applicable law may require otherwise, this Loan Agreement shall be construed in accordance with and governed by the substantive laws of the State of Florida (without giving effect to its conflicts of law provisions).

3

Docusign Envelope ID: 847A1519-6B09-4B04-9BC5-935FEB55C97E

(f)    This Loan Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Borrower:

*Steven Ivankovich*

Steven V. Ivankovich

Dated: December 15, 2025

Reorganized Debtors

By: *Mary Welfer*

Nancy Webber Authorized by the
Board of Directors of the Reorganized Debtors
To Execute this Loan Agreement
Dated: December 15, 2025

4

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ZHU ZHAI HOLDINGS LIMITED and PETER PUI TAK LEE, | ) ) ) Case No. 20-cv-04985 |
| Plaintiffs/Judgment Creditors, | ) ) |
| v. | ) Judge Sharon Johnson Coleman ) |
| STEVEN IVANKOVICH, | ) Hon Sidney I. Schenkier (Ret.), ) Special Master |
| Defendant/Judgement Debtor. | ) ) |

## REPORT AND RECOMMENDATION

Plaintiffs Zhu Zhai Holdings Limited and Peter Pui Tak Lee ("Plaintiffs") filed this action on August 24, 2020, to recover on a guaranty by Defendant Steven Ivankovich ("Steven") on some $3 million in loans to entities he controlled: specifically, Atlas Apartment Acquisitions, LLC and Atlas Residential Holdings, Limited. After Steven "repeatedly fail[ed] to meet court deadlines and participate in this lawsuit," the District Judge made an entry of default on July 1, 2021, and then on August 17, 2021, denied Steven's motion to vacate the entry of default and granted Plaintiffs' motion for default judgment in the amount of $4,503,842.00 – the loan amount plus interest, attorneys' fees and costs (doc. # 91: 08/17/21 Mem. Op. and Order at 1). Steven appealed the default judgment, and on May 6, 2022, the Seventh Circuit Court of Appeals affirmed the District Judge's entry of a default judgment, commenting that the default was the consequence of Steven "ignor[ing] the litigation" (doc. # 196: 05/06/22 Nonprecedential Disposition at 1).

When Steven failed to pay, Plaintiffs issued a number of citations to discover assets. One of those citations, served on Walker & Dunlop on January 20 2022 and subsequently amended, resulted in the disclosure of $1,521,000.00 in funds held in escrow that Walker & Dunlop represented were "returnable to five (5) different entities in which . . . [Steven] might have a direct

or indirect ownership interest" (doc. # 198: Citation Respondent Walker & Dunlop, LLC's Motion to Compel the Parties to Determine Judgment Debtor's Interest in Escrow Funds or Dismiss Amended Third-Party Citation, at 2-3). The five entities referenced by Walker & Dunlop -- Intervenors Pilgrim Warwick LLC, Pilgrim Coulter LLC, Pilgrim Windtree LLC, Pilgrim Caribbean Isle LLC, and Pilgrim Forest Park LLC (collectively, the "Third-Party LLCs") -- asserted their own interest in those funds, and moved to dismiss the citations (doc. #205). For their part, Plaintiffs sought a turnover of funds (doc. # 202). In an order dated December 16, 2022, the District Judge found that as of that time Plaintiffs had not shown they were entitled to turnover of the funds (doc. # 251: 12/16/22 Order at 4). At the same time, the District Judge denied the request to dismiss the citation, finding that "further proceedings are warranted to determine whether the [Third-Party LLCs] hold [Steven's] assets" (*Id.* at 6). The District Judge directed further discovery on that question (*Id.*).

Further discovery ensued, which was contentious and appears to have generated more heat than light on that question. As a result, on January 19, 2024, the District Judge appointed the undersigned to serve as Special Master "for the purpose of hearing and resolving issues and disputes related to the parties' post-judgment discovery proceedings, as identified in Plaintiffs' pending post-judgment motions, Dkts 276, 285" (doc. # 290: Order Appointing Special Master ("Appointment Order") at ¶ 1). Pursuant to that mandate, the District Judge directed the Special Master to address "issues related to but not limited to the parties' post-judgment discovery proceedings, the discovery produced thus far, and the location and amount of Judgment Debtor Ivankovich's assets" (*Id.*).

Shortly thereafter, on January 31, 2024, Walker & Dunlop moved to deposit the funds subject to the citation in the Court Registry and to receive a declaration that its obligations under

2

the citation were terminated (doc. # 291). On February 8, 2024, the District Judge granted that request (doc. # 296), and permitted Walker & Dunlop to deposit in the Court Registry funds totaling $1,494,619.10: a reduction of $49,929.90 from the amount originally reported as being held in the escrow, to account for attorneys' fees and expenses incurred by Walker & Dunlop in complying with and monitoring the citation (doc. # 291 at 7 n.2).

Plaintiffs allege that those funds on deposit with the District Court are controlled by Defendant, and should be turned over to them to help satisfy the default judgment – no amount of which, according to Plaintiffs, has been paid by Steven or through any other citation that has been served. For their part, Steven and the Third-Party LLCs assert that those funds belong to the Third-Party LLCs and should be released to them. To add to the mix, Jeanette Ivankovich ("Jeanette"), who is in a divorce proceeding with Steven, was given leave to intervene on March 19, 2024, and become a party to the proceedings before the Special Master (doc. # 307). Jeanette agrees with Plaintiffs that the funds are controlled by Steven and not the Third-Party LLCs, but asserts that she has a superior interest to those funds as compared to Plaintiffs.

After a five-month period of discovery (in addition to the lengthy period the parties had for discovery prior to the appointment of the Special Master), and after the continuance of the original hearing date occasioned by Steven and the Third-Party LLCs, the matter was set for an evidentiary hearing to commence on February 25, 2025, and to resume on February 27, 2025. The Special Master ruled that the issue to be addressed at the hearing was whether the funds on deposit with the Court (a) are an asset of the Steven, which should be held for distribution to Plaintiffs or to Jeanette as would be determined in a later, separate proceeding, or (b) instead should be released to the Third-Party LLCs.

The hearing took place as scheduled on February 25 and 27, 2025. Prior to the hearing, the parties filed memoranda outlining their positions and supporting authorities (doc. # 351: Plaintiffs' and Jeanette's Consolidated Pre-Hearing Mem.).[1] At the hearing, the parties called four witnesses to testify, and 37 exhibits were admitted into evidence. Thereafter, on March 28, 2025, the parties filed post-hearing memoranda: a consolidated memorandum by Plaintiffs and Jeanette ("Plaintiffs' Memorandum") (doc. # 368), and a consolidated memorandum by Steven and the Third-Party LLCs ("Defense Memorandum") (doc. # 369). Because the Defense Memorandum raised arguments and authorities not set forth in Defendants' pre-hearing memorandum, the Special Master allowed Plaintiffs and Jeanette to submit a consolidated supplemental memorandum, which they filed on April 8, 2025 ("Plaintiffs' Supplemental Memorandum") (doc. # 378).

The Special Master has carefully considered the evidence and the authorities offered by the parties. For the reasons set forth below, the Special Master recommends that the frozen funds be turned over to Plaintiffs or Jeanette, as to be determined in a future proceeding. In Part I below, the Special Master sets forth the relevant factual findings. In Part II below, the Special Master sets forth the legal principles that, when applied to the facts, leads to the Special Master's recommendation.

I.

The parties vigorously disagree about the ownership of the funds being held by the District Court as a result of the citation to discover assets served on Walker & Dunlop. Plaintiffs and Jeanette argue that, under the citation statute, the funds are an asset of Steven's that should be turned over. Steven and the Third-Party LLCs argue that the funds belong to the Third-Party LLCs

---

[1] Steven and the Third-Party LLCs filed a consolidated pre-hearing memorandum which is logged on JAMS Access, but it does not appear that they filed the pre-hearing memorandum on the District Court docket.

and should be released to them. The Special Master summarizes below the relevant evidence that bears on this issue.

### A.

There is no material dispute about how the funds in dispute made their way into the Walker & Dunlop escrow account. In 2017, Alliance HTTX and Alliance HTFL sought to obtain loans that would be secured by the five properties owned by the Third-Party LLCs. Pursuant to a loan agreement dated May 2, 2017, Walker & Dunlop extended loans totaling $86 million to Alliance HTTX (for the Texas properties Warwick, Wind Tree and Coulter Landing) and to HTFL (for the Florida properties Caribbean Isle and Forest Park) (TP LLC Ex. 1).[2] Steven was the guarantor of the loans (*Id.* at 8), and signed the loans as the manager of Alliance HTTX and Alliance HTFL (*Id.* at 125). At that time, Steven was also the managing member and 93 percent owner of Overlook Managing Member LLC ("Overlook") (JX 38), which in turn was the sole and managing member of each of the Texas and Florida properties (TP LLC Ex. 1A, at ¶ 1).

In June 2019, Walker & Dunlop agreed to refinance the loans to HTTX and HTFL for the properties owned by the Third-Party LLCs in the amount of $97 million (TP LLC Ex. 2A, at 1). Again, Steven was the guarantor of the loans (TP LLC Ex. 2, at 11 for each loan), and signed the closing statements as the authorized signatory of each of the Third-Party LLCs (TP LLC Ex. 2A, at 4). As part of the loan agreement, Walker & Dunlop established a cash management (or escrow) account over which it had "sole dominion and control" in order to ensure payment of taxes, insurance, operating costs and debt service (TP LLC Ex. 2, at § 2.6.2(a) for each loan), and thus to protect the properties that were security for the loans. As a result, neither Steven nor the Third-Party LLCs had access to the funds in cash management account during the pendency of the loans.

---

[2] The Third-Party LLC Exhibits are identified by "TP LLC Ex."; Plaintiffs' exhibits by "PX"; and Jeanette's Exhibits by "JX."

At the time of the closing of the loans, the cash management, or escrow, account appears to have had funds in the amount of $1,143,802.00 (TP LLC Ex. 2A, at 3).

By April 1, 2022, the amount held in the Walker & Dunlop escrow account had grown to $1,544,549.00. On that date, there was a closing on the sale of the two Florida properties which resulted in the payoff of the $97 million dollar loan, and a net balance payable of $35,273,113.47 (JX 30a, at 3, 8). Steven signed the closing statements for each of the properties that were sold as the authorized signatory (*Id.* at 4, 9). On April 1, 2022, the net proceeds of $35,372,113.47 from the sale were deposited in Alliance HTFL's Chase Account ending in 1602 (JX 30(b)).

Once the loan was paid off on April 1, 2022, Walker & Dunlop no longer had an interest in the escrowed funds (which had been held for the purpose of protecting the security for the Walker & Dunlop loan), and thus no longer controlled those funds (02/27/25 Tr. at 156). In the normal course, the escrowed funds would have been released to Alliance HTFL (the entity that had owned the Florida properties) (*Id.* at 138). That did not happen because prior to the sale of the Florida properties and pursuant to the default judgment entered against Steven on August 17, 2021, Plaintiffs served Walker & Dunlop with a citation to discover assets on January 20, 2022 (doc. # 124). As a result of the pending citation, Walker & Dunlop froze the escrowed and did not distribute them to Alliance HTFL.

**B.**

The evidence made clear that absent the citation served on Walker & Dunlop, after the April 1, 2022, sale of the Florida properties, the funds that Walker & Dunlop held in escrow would have been "released to the seller" (02/27/25 Tr. at 138) -- as was the case with the net proceeds from the sale. Thus, the Special Master considers the disposition of the sale proceeds to be highly relevant to the control that Steven would have been able to exercise over the escrowed funds had

6

they been released to the seller and, as with the net sale proceeds, deposited into the Alliance HTFL account. The evidence convincingly shows that Steven exercised complete control over the funds deposited into the Alliance HTFL account and was able to use them for personal (as opposed to Third-Party LLC) purposes as he saw fit.

Steven was an authorized signatory on the Alliance HTFL Chase Account 1602 (JX 9). Within one month of the April 1, 2022, closing, Steven transferred $30,777,000.00 from Chase Account 1602 into two other accounts having nothing to do with the Third-Party LLCs. Those transfers fell into two categories.

*First,* between April 1 and April 29, 2022, Steven made multiple wire transfers totaling $777,000.00 from Chase Account 1602 into the Glencoe Family Dwelling LLC Chase Checking Account 8261 (JX 30(b) and (c)). Steven is a signatory on Chase Account 8261 (JX 8). Prior to those transfers, there was a balance in Chase Account 8261 of only $427.32 (JX 30(c)). During the month of April 2022, Steven made transfers from Chase Account 8261 to pay $197,563.26 on a credit card that Steven and his wife used for personal purposes (02/25/25 Tr. at 38-39 and JX 33); to pay $9,000.00 for rent on property (920 W. George Street) leased as a family residence (JX 24); to make payments of $73,948.23 related to a yacht (Contessa Marine – Octopussy);[3] to pay $50,000,00 in connection with a tennis club; and to pay $18,358.36 to attorneys (Allison Rub Rodriguez and Beerman LLP) Steven had engaged in connection with his divorce proceedings (JX 30(c): entries dated 4/1/22, 4/4/22, 4/5/22, 4/8/22, 4/15/22, 4/18/22, 4/19/22, and 4/29/22). These payments clearly were for Steven's benefit and not for the benefit of the Third-Party LLCs.

---

[3] Steven testified that he has no ownership interest in the yacht, which he stated is owned by an entity that is 100 percent owned by his father, Anthony (02/25/25 Tr. at 141). Given the findings explained below as to Steven's lack of credibility as a witness, the Special Master is skeptical as to this testimony in the absence of Steven or the Third-Party LLCs' offering any evidence to substantiate the ownership. Ownership of the yacht aside, the fact remains that Steven used money from the proceeds of the sale of the Florida properties as he saw fit, and for purposes having nothing to do with the Third-Party LLCs.

7

*Second,* on April 6, 2022, Steven wire transferred $30 million from Chase Account 1602 to Stifel Nicolaus "Ref: For Further Credit to A & O Family LLC" with an account number ending in 8442 (JX 30(b)). Steven's testimony about this transfer was not credible. Steven testified that he "probably" would not have authorized that transfer (02/25/25 Tr. at 108), and that either Jennifer Traina (the other signatory on Chase Account 1602) or Shanna Willis (Vice President of Asset Management for the management company for the Third-Party LLCs) "could have" authorized the $30 million transfer (*Id.*). However, neither Steven nor the Third-Party LLCs offered testimony from Ms. Traina or documentary evidence that she did so. The failure to offer such evidence within Steven's control undermines his assertion that Ms. Traina authorized the transfer. *Kalmin v. Varan,* 2021 IL App (2021) 200755, at ¶ 41 ("An unfavorable evidentiary presumption also arises if a party, without reasonable excuse, fails to produce evidence under his or her control"). And Ms. Willis -- who is not a signatory on Chase Account 1602 -- testified that she would not have been able to make a $30 million transfer from the Alliance HTFL account "without authorization from Steven Ivankovich" (02/27/25 Tr. at 173). The Special Master finds Ms. Willis's testimony credible. The Special Master further finds that the evidence establishes that Steven transferred the $30 million in funds from the HTFL Chase Account 1602 to the A & O Family Account 8442.

Steven also testified that this transfer was "probably" a return of capital to his father, Anthony, for his investment in the five properties (02/25/25 Tr. at 108), an assertion that was supported by the testimony of Mark Brown, who in 2022 was asset manager of the Third-Party LLCs (02/27/25 Tr. at 278-79, 309), and by a declaration filed by Mr. Brown in a bankruptcy proceeding (JX 41 at ¶ 12). However, neither Steven nor the Third-Party LLCs offered testimony by Anthony Ivankovich to support this assertion, or any documentary evidence that Anthony Ivankovich advanced $30 million for the Third-Party LLCs or asked for it to be returned after the

8

sale of the Florida properties. Again, the unexplained failure to offer evidence to support the assertion of the purpose for the $30 million transfer undermines the credibility of the assertion. *See Kalmin*, 2021 IL App (2021) 200755, at ¶ 41.

Moreover, subsequent events demonstrate that substantial amounts of the $30 million were then used by Steven for his own purposes. On or about June 24, 2022, application was made for a Celadon Brokerage Services Account 1441 registered to A & O Family LLC that listed Steven as the sole "beneficial owner" of the account applicant – that is, the A & O Family LLC (JX 17 at § 2). The application identified Steven as the primary authorized principal and stated that there were no other persons with authority over the account or who had authority to transact in it (*Id.* at §§ 3 and 4). Steven signed the application for the Celadon Account 1441 as its primary authorized principal, and he is the only signatory on the application (*Id.* at § 15).

Steven denied the accuracy of the application for the Celadon Account 1441, and stated that he did not complete it, but that someone else had done so on his behalf (02/25/25 Tr. at 149-151). He also stated that the applicant, A & O Family LLC, was not owned by him but by his father (*Id.* at 261). However, Steven offered no evidence other than his own say-so to support that testimony, and he did not identify anyone else who had authority to transact in the account. Nor did he offer any documentary evidence to support his claim that, contrary to what is in the Celadon application, Steven's father -- and not Steven -- is the controlling owner of the A & O Family LLC that applied for the account.

Moreover, actions that Steven subsequently undertook with that account demonstrate his control over all of the relevant accounts and funds in them. On July 14, 2022, Steven wire transferred $25,417,223.59 from Account 8442 (the account into which he had transferred $30 million of the net proceeds of the sale on April 6, 2022) to the Celadon Account 1441 (JX 30(e)).

9

Steven denied that he made the transfer, or that the signature on the account transfer form (JX 30(e)) was his (02/25/25 Tr. at 152-57). He stated that this was all directed by his parents, that any "ownership I was given on a temporary basis . . . was to take advantage of my tax losses," and that various other people at various times had authority over the accounts (*Id.* at 158-59). Neither Steven nor the Third-Party LLCs offered any documentary evidence to support this testimony and offered no testimony by Steven's parents or the other individuals whom Steven identified as perhaps having authority to make this transfer. Nor did Steven offer any explanation for why someone else would place his signature on the account transfer form without his authority.

Moreover, what occurred next supports the proposition that Steven authorized the transfer of the funds from Account 8442 to the Celadon Account 1441. Between August 2022 and August 2023, Steven transferred $23,025,000.00 from the Celadon Account 1441 to the Glencoe Family Dwelling Checking Account 8261(JXs 6 and 14).[4] Over that same period and extending into November 2023, Steven paid large sums from Account 8261 to satisfy personal expenses, including:

- numerous credit card payments;

- a payment of $50,000 to a tennis club (JX 6, Statement for August 2022, at 2);

- payments exceeding $1 million in connection with a yacht (*Id.*, Statement for September 2022, at 2-3);

- payments to his divorce lawyers of $26,541.57 in January 2023, $10,858.20 in February 2023, and $43,500.00 in March 2023 (*Id.*, Statements for January 2023, at 2, February 2023, at 3 and March 2023, at 3);

- payments of $165,378.00 in March 2023, $137,701.50 in May 2023, $69,602.05 in June 2023, $164,136.01 in August 2023, $92,737.81 in September 2023, $223,655.29 in October 2023, and $134,010.29 in November 2023 in connection with his yacht crew (*Id.*,

---

[4] In addition, counsel for Steven and the Third-Party LLCs stipulated that "the same amounts that were disbursed out of the Celadon account were deposited into the Chase account . . .,8261, and that the document shows that the deposit came through the U.S. Bank" (02/25/25 Tr. at 199-200).

Statements for March 2023 at 2, May 2023 at 2-3, June 2023 at 2, August 2023 at 2, September 2023 at 2, October 2023 at 2, and November 2023 at 2);

- a payment of $315,000.00 in November 2023 for yacht transport (*Id.*, November 2023 Statement at 2);

- payments of $25,000.00 in March 2023, $25,000.00 in August 2023, and $25,000.00 in September 2023 to Mr. Goldstein and of $47,713.68 in November 2023 to Chuhak Tecson, counsel for the Third-Party LLCs (*Id.*, Statements for March 2023 at 2, August 2023 at 3, September 2023 at 3, and November 2023 at 2);

- a payment of $30,000.00 to Mr. Wanderer, Steven's counsel in this matter, in October 2023 (*Id.*, October 2023 Statement at 2); and

- a payment to Steven's divorce attorney Ms. Rodriguez of $12,898.00 in June 2023 (*Id.*, Statement for June 2023 at 2).

## C.

The foregoing evidence shows that Steven did as he wished with the net proceeds of the April 1, 2022, sale of the Florida properties. He immediately transferred $777,000.00 directly into the Glencoe Family Dwelling Account 8261 and used hundreds of thousands of dollars of those funds for personal (and not Third-Party LLC) expenses. Less than one week later, on April 6, 2022, he transferred $30,000,000.00 of the proceeds into the A & O Family Account 8442, $23,025,000.00 of which through two separate transfers in July and August 2022 he placed into that same Glencoe Family Dwelling Account 8261. And during the period August 2022 through the end of 2023, Steven paid from that account millions of dollar of expenditures for personal purposes and not for the benefit of the Third-Party LLCs.

There is no evidence that the Third-Party LLCs ever complained about Steven removing from the Alliance HTFL account nearly $31 million of the net proceeds from the sale of the Florida properties or asserted that those funds belonged to the Third-Party LLCs and should remain in the Alliance HTFL account. Steven's exercise – without objection – of complete dominion over the proceeds from the sale of the properties shows that he would have done the same with the money

held in the Walker & Dunlop account escrow that would have been released to the Alliance HTFL account (or some other account for the Third-Party LLCs) but for the freeze imposed by the citation in this case.

Finally, while the Special Master has cited above several specific instances where he has found Steven's testimony lacked credibility, it is important to note that a lack of credibility permeated Steven's testimony. Plaintiffs' and Jeanette's post-hearing memorandum catalogues a number of instances beyond those cited above of Steven offering testimony that simply was not believable (Plaintiffs' Post-Hearing Mem. at 4-7), including, for example, testimony in which Steven (a) asserted a lack of familiarity with Walker & Dunlop (02/25/25 Tr. at 55), an entity in which he signed for and guaranteed loans in 2017 and 2019 totaling more than $180 million; and (b) stated that he was not involved in the sale of the Florida properties on April 1, 2022 (*Id.* at 87), even though he signed the closing statements for the sale of each of the properties as the authorized signatory. Steven was repeatedly evasive, combative or flippant, and exhibited a level of disrespect for the process that the Special Master rarely has seen in his 46 years of involvement in the legal profession.

To summarize, the Special Master finds that Steven exercised complete dominion over the disposition of the funds from the sale of the Florida properties, and put much of that money to his personal use. The Special Master further finds that this evidence shows that, but for the freeze of the money held by Walker & Dunlop at the time of the sale of those properties, Steven would have exercised the same dominion over those funds.

## II.

Illinois law allows a judgment creditor to serve citations to discover assets in order to locate "assets belonging to the judgment debtor that [a] third party may have in its possession." *Kalmin,*

2021 IL App. (1st) 200755, at ¶ 34. The judgment creditor has the burden of showing that a citation respondent "possesses assets belonging to the judgment creditor." *Id.* Thus, Plaintiffs and Jeanette have the burden of proving that the frozen funds that were in the possession of Walker & Dunlop were assets belonging to Steven. The Special Master finds that the Plaintiffs and Jeanette have met that burden.

In so finding, the Special Master is mindful that the provisions of the citation statute are to be "liberally construed," *Kalmin*, 2021 IL App. (1st) 200755, at ¶ 34. That is so in light of the reality that the citation procedure is invoked because a judgment debtor resists paying a judgment for which it has been held responsible. *See Nat'l Life Real Estate Holdings, LLC v. Scarlato*, 2017 IL App. (1st) 161943, at ¶ 22 (2017) (Section 2-1402 is a "means of forestalling the judgment debtor or a third party from frustrating the supplementary proceedings before the judgment creditor has had an opportunity to reach assets, . . . in the possession of [the] debtor or of a third party.") In line with that liberal construction, the phrase "assets belonging to the judgment debtor" is treated as "very open-ended." *Nat'l Life Real Estate Holdings*, 2017 IL App. (1st) 161943, at ¶ 36.

In *Scarlato*, the plaintiff had obtained a judgment of nearly $3.5 million against the defendants (including Scarlato), and had served a citation to discover assets against International Bank of Chicago ("IBC") in an effort to collect on that judgment. Thereafter, the defendants/judgment debtors obtained a $3.5 million loan from IBC, but the loan terms provided that advances on the loan could only be obtained at the request of Scarlato personally or in his capacity as a managing member of entities who were not judgment debtors. Proceeds of the loan were then disbursed, but none of the proceeds went to Scarlato or to any of the other judgment debtors. The trial court agreed with IBC's position that the loan proceeds were not Scarlato's assets, and that IBC thus did not violate the citation by disbursing them to third parties.

13

The appellate court reversed. The appellate court explained that "even though the loan proceeds were not disbursed to Scarlato, they still *belonged* to him within the meaning of Section 2-1402." *Nat'l Life Real Estate Holdings*, 2017 IL App. (1st) 161943, at ¶ 33 (emphasis in original). That was so in light of the evidence that even though Scarlato did not receive the loan proceeds, the structure of the loan agreement showed that he had "a legal right to access the proceeds of the loan at issue here," and he arguably "could have used the loan proceeds for his own personal use or for payment to [another] entity." *Id.*, ¶¶ 30, 36. Thus, the appellate court concluded that the loan proceeds belonged to Scarlato within the meaning of the statute and that IBC violated the statute by disbursing the loan proceeds.[5]

While the facts evidencing control here differ from those in play in *Scarlato*, the evidence established that Steven in fact had complete control over the funds held in escrow by Walker & Dunlop upon the closing of the sale of the Caribbean Isle and Forest Park properties in Florida on April 1, 2022, which satisfied all outstanding loans issued by Walker & Dunlop and brought into HTFL more than $35 million. The satisfaction of the loans extinguished Walker & Dunlop's interest in – and control over – the money that had been held in escrow for insurance, taxes, operating expenses and debt service, as that money was no longer needed to protect Walker & Dunlop's security interest in the properties. Thus, as of April 1, 2022, Walker & Dunlop had no more right to, or control over, the money in the escrow account than it had in the $35 million payable to HTFL from the sale of the properties.

The evidence shows that immediately upon receipt of the $35 million in sale proceeds that were deposited into the HTFL account, Steven began exercising control over those funds. On April

---

[5] The Special Master notes that the dissent in *Scarlato* disagreed with the conclusion reached by majority, but agreed with the principle that "a loan might be the property of the debtor in a citation proceeding – even where the loan proceeds are not paid directly to the debtor/borrower but distributed to a third party – if the debtor/borrower had the legal right to obtain those funds." 2017 IL App. (1st) 161943, ¶ 56.

14

6, 2022, Steven wire transferred $30 million of that amount from the HTFL account to the A&O Family LLC Account 8442 for which he was signatory (JXs 30(b) and (e)). During the month of April 2022, Steven made numerous transfers from the HTFL account to the Glencoe Family Dwelling account 8261 totaling $777,000.00 (JX 30(c)). The Third-Party LLCs did not object or assert their ownership of those funds.

Thereafter, in July 2022, Steven transferred more than $25 million from the A&O Family LLC account 8442 to an A & O Family Account with Celadon (Number 1441) – for which he signed he application, is listed as the beneficial owner, and is the sole individual authorized to withdraw funds (JX 17) – and then over the course of 13 months transferred more than $23 million to the Glencoe Family Dwelling Account 8261 (*compare* JXs 6 and 14). This was in addition to the several hundred thousand dollar that Steven spent from the $777,000.00 deposit into the Glencoe Family Dwelling Account 8261 in April 2022.

Moreover, as explained above, the evidence shows that these funds from the sale of the Florida properties that Steven transferred into the Glencoe Family Dwelling Account were often used for personal purposes – such as personal credit card debt, rent for a dwelling, payment for items relating to a boat, and payment for lawyers Steven engaged for his divorce proceedings -- that had nothing to do with the operation of any of the Third-Party LLCs. There is no question but that Steven exercised control over the proceeds from the sale of the Florida properties, and used them as he saw fit.

The Special Master finds that the control that Steven exercised over the proceeds from the sale of the Florida properties is telling evidence as to his control over the funds held in the Walker & Dunlop escrow account. At the time of the closing on the sale of the Florida properties on April 1, 2022, the citation had been served on Walker & Dunlop and the funds in the escrow account

were thus frozen and *for that reason alone* were beyond Steven's reach. Had the citation not been in place, there would have been no restriction on Steven's access to the escrowed funds – just as there was no restriction on his access to the net proceeds from the sale. The control he exercised over the use of the proceeds from the sale is persuasive evidence showing the control he had (but for the citation proceeding) over the funds from the Walker & Dunlop escrow account as of April 1, 2022.[6]

Steven and the Third-Party LLCs argue that *Scarlato* should not apply, pointing to factual and procedural differences between that case and the situation presented here (Defense Mem. at 14-15). The Special Master disagrees. The distinctions relied upon by Steven and the Third-Party LLCs do not detract from the fundamental teaching of *Scarlato* that the touchstone of whether funds held by a third party may be turned over to satisfy a debtor's judgment is whether the funds belong to the debtor, which can be shown by the "legal right to access" the funds. 2017 IL App. (2017) 161943, ¶¶ 30, 33. The *Scarlato* court did not state that the right to access can only be proven through one path. Here, the evidence showing Steven's access to and control over the loan proceeds likewise shows his control over the funds in the Walker & Dunlop escrow account once the sale of the Florida properties closed on April 1, 2022. Neither Steven nor the Third-Party LLCs offered any evidence that the Third-Party LLCs resisted Steven's transfers of $30 million of the sale proceeds into accounts that he controlled, much of which was put to personal use.

Steven and the Third-Party LLCs resist the conclusion that the escrowed funds belong to Steven by emphasizing that the Walker & Dunlop escrow was established prior to the judgment

---

[6] The fact that the citation was served prior to April 1, 2022, at a time when, under the loan agreement Walker & Dunlop still maintained "sole dominion and control" over the escrowed funds (LLC Ex. 2A, §2.6.2), is of no moment. Section 2-1402(f)(1) applies to assets "belonging to the judgment debtor to which he or she may be entitled or which may thereafter be acquired by or become due to him or her." As of the closing of the sales on April 1, 2022, Walker & Dunlop no longer had any interest in the escrowed funds which, for the reasons stated above, the Special Master finds came under the control of Steven.

(presumably to show that the escrow account was not a ruse to avoid payment of the judgment) and that Steven "*never* transacted from the escrow accounts at issue" (Defense Mem at 17) (emphasis in original). That argument misses the point that the reason Steven *never* transacted from the escrow account prior to April 1, 2022, is that the Walker & Dunlop loan agreement prevented him from doing so, and that the reason he *never* transacted from the escrow account after that date was the prohibition stemming from the citation. The evidence persuades the Special Master that, but for the issuance of the citation, Steven would have been free to access those funds previously held in escrow and to put them to personal use – just as he did with the proceeds from the sale of the Florida properties.[7]

Steven and the Third-Party LLCs attempt to avoid the import of this evidence by claiming that because the money in the Walker & Dunlop escrow account originated from the 2019 loan and rental income from the properties, that the Third-Party LLCs "clearly hold title" to those funds (Defense Mem. at 1). However, that argument ignores the common-sense principle that "where substantial evidence shows that the paper title cannot be trusted, Illinois courts will consider other factors to determine true ownership of the property in dispute." *United States v. Miller*, 39 F.4th 844, 851 (7th Cir. 2022). The Seventh Circuit drew that principle from *People v. Chicago Title & Trust Co.*, 389 N.E.2d 540, 545 (Ill. S. Ct. 1979), in which the Illinois Supreme Court observed in deciding a land taxation dispute that "[w]hile title may be a factor in determining ownership it is

---

[7] During the hearing, Steven's counsel elicited testimony that even after the closing on the sale of the Florida properties, there were taxes and insurance that remained to be paid (02/27/25 Tr. at 160). Similarly, defense counsel elicited testimony that the Texas properties failed to generate revenue sufficient to cover taxes and insurance, and were able to cover insurance only through monies advanced from the A & O Family Account (02/27/25 at 197-98). To the extent this testimony was elicited to suggest that Steven would not have taken the funds from the escrow even in the absence of the citation – an argument not made in the post-hearing memorandum – the Special Master is unpersuaded. Within one month of the $35 million flowing into HTFL, Steven redirected nearly $31 million which he moved into accounts and used for many personal purposes. Had Steven been concerned about the ability of the Texas properties to make tax and insurance payments, of course, those funds could have remained with HTFL and used to make those payments (*see id.* at 161).

not decisive. Of far greater importance is control of the property and the right to its benefits." In *Miller*, the Seventh Circuit cited other Illinois state court decisions making clear that "[t]he idea that title does not always control ownership extends beyond taxes to other areas in Illinois law as well." 39 F.4th at 851; *see also Levine v. City of Chicago*, 2024 IL App (1st) 231245, ¶ 71 (observing that "control, rather than title, determines ownership").

The evidence here shows that Steven controlled the disposition of the net proceeds from the sale of the Florida properties. By the reasoning of Steven and the Third-Party LLCs, because those proceeds came from the sale of the properties and the funds remaining after payoff of the loans, the Third-Party LLCs also "clearly would hold title" to those proceeds. Yet, without any objection by the Third-Party LLCs or attempt by them to assert ownership, Steven exercised complete dominion over those proceeds and used them as he saw fit – including for many purposes having nothing to do with the Third-Party LLCs but instead for his personal benefit. This evidence leaves no doubt that but for the restraint imposed by the citation, the same would have occurred with respect to the escrowed funds. This is a case where any claim by the Third-Party LLCs to title "cannot be trusted." *Miller*, 39 F.4th at 851. In this proceeding under the citation statute, where the phrase "assets belonging to the judgment debtor" is treated as "very open-ended" standard, *Nat'l Life Real Estate Holdings*, 2017 IL App. (1st) 161943, at ¶ 36, the Special Master finds that the evidence convincingly shows that the escrowed funds are assets that belong to Steven.

## A.

The defense offers several additional arguments in aid of their position that the funds should be returned to the Third-Party LLCs. The Special Master finds them to be without merit.

*First*, Defendants argue that Plaintiffs and Jeanette are improperly seeking to obtain funds of the Third-Party LLCs through a "reverse piercing" of the corporate veil – that is, by seeking to

make the Third-Party LLCs liable for Steven's debt. Steven and the Third-Party LLCs contend that reverse veil piercing is not permitted under Delaware law and, in any event, that Plaintiffs and Jeanette have not established in the evidence a right to any veil piercing (Defense Mem. at 7-13). This is a straw man argument, as Plaintiffs and Jeanette do not seek to pierce the corporate veil in this proceeding, and under Illinois law would not be permitted to attempt to do so. *Pyshos v. Heart-Land Development Co.*, 258 Ill. App. 3d 618, 624 (1st Dist. 1994) ("[W]hat must be alleged to pierce the corporate veil does not fall within the scope of what may be heard in supplementary proceedings"). Moreover, Steven's and the Third-Party LLCs' argument fails at the threshold because it assumes the answer to the very question that the hearing was designed to address: whether the frozen funds are those of the Third-Party LLCs or whether they are Steven's assets within the meaning of the citation statute. As explained above, the evidence convincingly shows that the funds are Steven's assets and therefore there is no occasion to consider any question of piercing the corporate veil. *See Kalmin*, 2021 IL App (1st) 200755, at ¶ 39.[8]

*Second*, Steven and the Third-Party LLCs argue that the most that Plaintiffs and Jeanette would be entitled to receive as Steven's creditors would be a "charging order" against his interest in the funds of the Third-Party LLCs (Defense Mem. at 7). As with the reverse piercing argument, this contention fails because it assumes a fact that has been contradicted by the hearing evidence: that the funds held by Walker & Dunlop were not Steven's assets but were assets of the Third-Party LLCs. There is no occasion here for a "charging order" for distribution of funds by the

---

[8] The Special Master also notes that it is not so clear as Steven and the Third-Party LLCs suggest that reverse veil piercing is not cognizable under Delaware law. *See Manichaean Capital, LLC v. Exela Technologies, Inc.*, 251 A.3d 694, 714 (Del. Ch. Ct. 2021) ("there is a place for a carefully-circumscribed reverse veil-piercing within Delaware law"); *see also Sky Cable, LLC v. Direct TV, Inc.*, 886 F.3d 375, 389 (4th Cir. 2018) (affirmed the application of reverse veil piercing under Delaware law).

Third-Party LLCs that the Special Master has found in fact are assets of Steven's under the citation statute.

*Third,* while not raised in the post-hearing memorandum, Steven and the Third-Party LLCs suggested by certain objections and colloquy during the hearing that a finding that the frozen funds should be turned over would interfere with a pending bankruptcy proceeding (02/25/25 Tr. at 144-45, 181-83). Nothing could be further from the truth. The bankruptcy proceeding referenced involves A & O Family LLC (IL), A & O Family LLC (FL) and Atlas P2 – not the Third-Party LLCs (*see* Special Master's Order No. 12, 10/28/24, doc. # 329, at 4). There is no claim that the frozen funds are assets of any of the entities in bankruptcy, and there has been no assertion that the bankruptcy stay prevents this proceeding from going forth.

*Fourth,* again while not raised in the post-hearing memorandum, Steven and the Third-Party LLCs suggested during the hearing that a prior order by the District Judge precludes a finding that the frozen funds are Steven's assets subject to turnover (02/25/25 Tr. at 143). The Special Master is mindful that the District Judge previously held that, on the state of the record then before her, Plaintiffs had failed to show that funds of the Third-Party LLCs were Steven's assets (doc. # 251: 12/16/22 Order at 4). It appears from the order that the only evidence Plaintiffs offered to support a request to use funds *held by the Third-Party LLCs* to satisfy the judgment was Steven's "near total ownership interest in Overlook . . ., which wholly owns" each of the Third-Party LLCs (*Id.*). The question presented here is different: that is, whether the funds *held by Walker & Dunlop* are funds of the Third-Party LLCs or assets of Steven's.

The District Judge's order plainly did not answer that question. To the contrary, the District Judge denied the request to dismiss the citation issued to Walker & Dunlop. The District Judge rejected the argument that a state court order dismissing a citation against Walker & Dunlop

collaterally estopped Plaintiffs' claim for turnover (doc. # 251: 12/16/22 Order at 5). The District Judge found that further proceedings were warranted to determine whether the Third-Party LLCs held Steven's assets (*Id.* at 6). Those proceedings have now taken place, and the evidence presented at the hearing before the Special Master shows that those funds are Steven's assets, which but for the citation he would have controlled and put to personal use.

## CONCLUSION

For the reasons set forth above, the Special Master respectfully recommends that the District Judge (a) rule that the funds held in the Court Registry from the citation to Walker & Dunlop are assets of Steven within the meaning of the citation statute; and (b) direct that further proceedings be conducted to determine whether those funds should be distributed to Plaintiffs or to Jeanette.

Any party may file an objection to this Report and Recommendation within 10 days of this Report and Recommendation being filed (Order Appointing Special Master, 01/19/24, at ¶ 1).

**HON. SIDNEY I. SCHENKIER (RET.)**
**Special Master**
**May 14, 2025**